# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID SPEISER, Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>   v.<br><br>BLUE APRON HOLDINGS, INC., MATTHEW B. SALZBERG, ILIA M. PAPAS, MATTHEW J. WADIAK, JARED CLUFF, PABLO CUSSATTI, BENJAMIN C. SINGER, JULIE M.B. BRADLEY, TRACY BRITT COOL, KENNETH A. FOX, ROBERT P. GOODMAN, GARY R. HIRSHBERG, BRIAN P. KELLEY and BRADLEY J. DICKERSON,<br><br>          Defendants. | **Case No.**<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff David Speiser ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Blue Apron Holdings, Inc. ("Blue Apron" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Blue Apron securities: (1) pursuant and/or traceable to Blue Apron's false and misleading Registration Statement and Prospectus, issued in connection with the Company's initial public offering on or about June 29, 2017 (the "IPO" or the "Offering"); and/or (2) on the open market between June 29, 2017 and August 9, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Blue Apron Holdings, Inc. operates as a holding company. The Company, through its subsidiaries, provides meal-kit delivery services. Blue Apron sends weekly boxes of pre-portioned ingredients with instructions for customers to cook meals at home.

3.      Founded in 2012, Blue Apron is headquartered in New York, New York.  Blue Apron has two classes of voting common stock, Class A common stock and Class B common stock, and one class of non-voting stock, Class C capital stock. The rights of the holders of Class A common stock, Class B common stock, and Class C capital stock are identical, except for voting and conversion rights. Each share of Class A common stock is entitled to one vote, and each share of Class B common stock is entitled to ten votes. Shares of Class C capital stock have no voting rights, except as otherwise required by law. Only the Class A common stock was offered in the IPO, and following the IPO, Blue Apron Class A common stock began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "APRN."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) rather than continue to significantly increase spending on advertising, Blue Apron had already decided to significantly reduce spending on advertising in Q2 2017, which would hurt sales and profit margins in future quarters; (ii) Blue Apron was already experiencing adverse on-time in-full rates, meaning orders were not arriving on time or with all the ingredients needed, which was hurting customer retention; (iii) the Company had encountered delays in Q2 2017 associated with its new factory in Linden, New Jersey, a factory which is expected to eventually account for more than half of the meal kits Blue Apron sells; (iv) existing and already-materialized delays at the Company's new factory in Linden were resulting in additional delays in new product rollouts, which was limiting Blue Apron's ability to gain new customers and retain existing ones; (v) the foregoing delays would hurt the Company's bottom line in the near-term, particularly affecting the important metric of lifetime value per customer (*i.e.*, the net profit Blue Apron makes off a customer); (vi) the Company was unable to fully execute its new product initiatives; (vii) Blue Apron had already decided it would be forced to change its strategic approach in managing the business for the remainder of 2017; and (viii) as a result of the foregoing, Blue Apron's public statements were materially false and misleading at all relevant times.

5.     On August 10, 2017, Blue Apron revealed that it had encountered delays associated with its new factory in Linden, New Jersey, leading to additional delays in new product rollouts, thereby impeding Blue Apron's ability to gain new customers and maintain current customers.

6.     Following this news, Blue Apron's share price fell $1.10, or more than 17%, to close at $5.14 on August 10, 2017, a 50% drop from the IPO price.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Blue Apron's principal executive offices are located within this Judicial District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired Blue Apron securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Blue Apron is incorporated in Delaware with principal executive offices located at 5 Crosby Street, New York, New York 10013. Blue Apron's shares trade on the NYSE under the ticker symbol "APRN."

14.     Defendant Matt Salzberg ("Salzberg") served at all relevant times, a Founder, President, Chief Executive Officer ("CEO") and director of Blue Apron.

15.     Defendant Bradley Dickerson ("Dickerson") served at all relevant times, the Company's Chief Financial Officer ("CFO") and Treasurer.

16.     Defendant Pablo Cussatti ("Cussatti") served at all relevant times, the Company's Senior Vice President of Operations and Fulfillment.

17.     Defendant Ilia Papas ("Papas") served at all relevant times, the Company's Chief Technology Officer.

18.     Defendant Matthew J. Wadiak ("Wadiak") served at all relevant times, the Company's Chief Operating Officer ("COO").

19.     Defendant Jared Cluff ("Cluff") served at all relevant times, the Company's Chief Marketing Officer ("CMO").

20.     Defendant Benjamin C. Singer ("Singer") served at all relevant times, the Company's Secretary and general counsel.

21.     Defendant Julie M.B. Bradley ("Bradley") has been a Director of Blue Apron's Board since November 2015 and is a member of the audit committee and compensation committee.

22.     Defendant Tracy Britt Cool ("Cool") has been a Director of Blue Apron's Board since January 2017 and is a member of the audit committee and the nominating and corporate governance committee.

23.     Defendant Kenneth A. Fox ("Fox") has been a Director of Blue Apron's Board since April 2014 and is a member of the audit committee.

24.     Defendant Robert P. Goodman ("Goodman") has been a Director of Blue Apron's Board since November 2015 and is a member of the compensation committee.

25.     Defendant Gary R. Hirshberg ("Hirshberg") has been a Director of Blue Apron's Board since October 2016, and is a member of the compensation committee and the nominating and corporate governance committee.

26.     Defendant Brian P. Kelley ("Kelley") has been a Director of Blue Apron's Board since April 2017, and is a member of the nominating and corporate governance committee.

27.     The Defendants referenced above in ¶¶ 14-26 are sometimes referred to herein as the "Individual Defendants."

28.     Defendant Blue Apron and Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29.     Blue Apron Holdings, Inc. operates as a holding company. The Company, through its subsidiaries, provides meal-kit delivery services. Blue Apron Holdings sends weekly boxes of pre-portioned ingredients with instructions for customers to cook meals at home.

30.     On March 31, 2017, Blue Apron filed a Draft Registration Statement with the SEC. On June 1, 2017, Blue Apron filed a Registration Statement on Form 5-1 with the SEC. On June 28, 2017, Blue Apron filed its final amendment to the Registration Statement, which registered over 34 million Blue Apron shares for public sale.

31.     The Registration Statement contained a preliminary prospectus. The S-1 Registration Statement was declared effective by the SEC on June 28, 2017, and Blue Apron filed its final prospectus with the SEC on June 29, 2017 (the "Prospectus"). The Registration Statement and the Prospectus are collectively referred to herein as the "Registration Statement."

32.     Blue Apron priced the IPO at $10.00 per share. Through the IPO, Defendants issued and sold over 30 million shares. After deducting underwriting fees of $16.5 million, the Company generated $283,500,000 in proceeds for the Company, before expenses.

**Materially False and Misleading Statements Issued During the Class Period**

33.     The Class Period begins on June 29, 2017 when Blue Apron filed its Registration Statement with the SEC.   The Registration Statement, signed by each of the Individual Defendants, stated the following:

We have reimagined the traditional grocery business model and developed an integrated ecosystem that employs technology and expertise across many disciplines. Our supply-demand coordination activities—demand planning, recipe creation, recipe merchandising, and marketing—drive our end-to-end value chain. We gather and infer information about our customers' tastes, food preferences, and order behavior to forecast near-term and long-term demand. We also manage and influence demand, including through our content, proprietary software tools, and e-commerce experience. For example, our flexible recipe design process allows us to adjust recipes close to the time of delivery, enabling us to coordinate customer preferences with expected ingredient supply to help mitigate supply chain risks. Because our customers select recipes instead of specific ingredients, we can make adjustments while maintaining a consistent, high-quality customer experience. Our innovative direct-to-consumer business model enables us to:

- eliminate middlemen and work in a direct, coordinated manner with our suppliers to reduce costs so we can make our products available affordably and at scale;
- provide consumers with differentiated, specialty ingredients, many of which are not widely available and are exclusive to us;
- develop and implement proprietary technology across our fulfillment operations to effectively manage our frequently changing, high-throughput, perishable inventory; and
- design and optimize a cost-effective delivery network capable of reaching over 99% of the U.S. population.

Our greatest strength is our highly collaborative and multidisciplinary team, which includes agricultural scientists, software and industrial engineers, data scientists, brand and direct marketers, quality and fulfillment associates, operations specialists, photographers, customer experience representatives, recipe writers, and world-class chefs. Our shared commitment to making home cooking accessible to everyone defines our work and focuses our efforts.

34. The Company further stated the following in its Registration Statement regarding

its profit margins:

In 2014, 2015, and 2016, we generated $77.8 million, $340.8 million, and $795.4 million in net revenue, respectively, representing growth of 338% from 2014 to 2015 and growth of 133% from 2015 to 2016. In the three months ended March 31, 2016 and March 31, 2017, we generated $172.1 million and $244.8 million in net revenue, respectively, representing growth of 42%. In the years ended December 31, 2014, 2015, and 2016, we incurred net losses of $(30.8) million, $(47.0) million, and $(54.9) million, respectively, and in the three months ended March 31, 2016 and March 31, 2017, we generated net income of $3.0 million and incurred a net loss of $(52.2) million, respectively. In the years ended December 31, 2014, 2015, and 2016, our adjusted EBITDA was $(26.5) million, $(42.9) million, and $(43.6) million, respectively, and in the three months ended March 31, 2016 and March 31, 2017, our adjusted EBITDA was $5.0 million and $(46.3) million, respectively. In the years ended December 31, 2014, 2015, and 2016, our net cash from (used in) operating activities was $(16.9) million, $(26.4) million, and $(23.5) million, respectively, and in the three months ended March 31, 2016 and March 31, 2017, our net cash from (used in) operating activities was $6.0 million and $(19.0) million, respectively.

35. The Registration Statement also stated that the Company was expanding spending

on advertising, and that doing so was important to retaining existing clients and attracting new

ones, and that the Company expected to continue to increase its advertising campaigns:

*"Our growth will depend in part on our ability to cost-effectively launch marketing campaigns that attract and retain customers and successfully promote awareness of our brand… We intend to continue investing in marketing and offering promotional discounts to drive customer acquisition.* We are also increasingly focused on using marketing to drive customer retention, customer engagement and brand awareness, and to support that effort we have expanded our investment in offline paid marketing."

(Emphasis added).

36.     Regarding advertising spending, the Registration Statement also stated: "*During the period from 2014 to 2016, our marketing expenses increased from $14 million to $144 million, an increase of approximately 930%. As part of scaling our marketing strategy, we have increased marketing expenses related to all three of our major advertising channels* (offline media, online media and our customer referral program). Beginning in 2016, however, a larger portion of our spending has been on offline channels. We believe increased emphasis on offline channels will drive stronger brand awareness, customer engagement and, ultimately, customer retention," (emphasis added).

37.     The Registration Statement contained the following details regarding the Company's spending on advertising:

> *We spend significant amounts on advertising and other marketing activities*, such as television, digital and social media, direct mail, radio and podcasts, and email, to acquire new customers, retain and engage existing customers, and promote our brand, and *we expect our marketing expenses to continue to comprise a significant portion of our operating expenses*. For 2014, 2015 and 2016, our marketing expenses were $14.0 million, $51.4 million and $144.1 million, respectively, representing approximately 17.9%, 15.1% and 18.1% of net revenue, respectively. *For the three months ended March 31, 2016 and 2017, our marketing expenses were $25.4 million and $60.6 million, respectively, representing approximately 14.8% and 24.8% of net revenue, respectively.*

(Emphasis added).

38.     The Registration Statement also stated that the following were some of the Company's key operating metrics:

9

| | | | Three Months Ended | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | March 31, 2015 | June 30, 2015 | September 30, 2015 | December 31, 2015 | March 31, 2016 | June 30, 2016 | September 30, 2016 | December 31, 2016 | March 31, 2017 |
| Orders (in thousands) | 841 | 1,247 | 1,763 | 1,970 | 2,903 | 3,399 | 3,597 | 3,674 | 4,273 |
| Customers (in thousands) | 213 | 303 | 414 | 429 | 649 | 766 | 907 | 879 | 1,036 |
| Average Order Value | $ 57.77 | $ 58.74 | $ 58.01 | $ 59.21 | $ 59.28 | $ 59.40 | $ 57.12 | $ 58.78 | $ 57.23 |
| Orders per Customer | 3.9 | 4.1 | 4.3 | 4.6 | 4.5 | 4.4 | 4.0 | 4.2 | 4.1 |
| Average Revenue per Customer | $ 228 | $ 242 | $ 247 | $ 272 | $ 265 | $ 264 | $ 227 | $ 246 | $ 236 |
| Net revenue (in thousands) | $ 48,586 | $ 73,271 | $ 102,283 | $ 116,663 | $ 172,098 | $ 201,924 | $ 205,452 | $ 215,942 | $ 244,843 |
| Adjusted EBITDA (in thousands) | $ (6,689) | $ (8,525) | $ (18,310) | $ (9,352) | $ 5,048 | $ 7,976 | $ (34,627) | $ (22,018) | $ (46,265) |

*Orders*

We define Orders as the number of paid orders by our Customers across our meal, wine and market products sold on our e-commerce platforms in any reporting period, inclusive of orders that may have eventually been refunded or credited to customers. Orders, together with Average Order Value, is an indicator of the net revenue we expect to recognize in a given period. We view Orders delivered as a key indicator of our scale and growth. Orders has limitations as a financial and operating metric as it does not reflect the product mix chosen by our customers or the purchasing behavior of our customers. For example, we view Repeat Orders as a useful metric when evaluating revenue retention. We define a Repeat Order as an Order from a Customer who has previously placed an Order in any period, including the current period. Repeat Orders has limitations as a financial and operating metric as it does not measure the frequency or the value of Orders. Because of these and other limitations, we consider, and you should consider, Orders (and Repeat Orders) in conjunction with our other metrics, including net revenue, net income (loss), adjusted EBITDA, Average Order Value and Orders per Customer.

39.     The Registration Statement further stated that Blue Apron's marketing expenses per customer were declining, and that its net revenues per customer were increasing, and stated:

Using the same methodology as above, ***cumulative net revenue per Customer for the six months after such Customer's first Order was $402 for 2014 cohorts, $451 for 2015 cohorts and $387 for 2016 cohorts. We believe Cost per Customer accurately represents our average marketing spend per Customer for the periods presented.*** Cumulative net revenue per Customer is driven by our ability to retain and engage Customers once we have acquired them, and therefore we believe cumulative net revenue per Customer accurately portrays Customer behavior relative to the costs incurred to acquire, engage and retain Customers.

We believe the above cohorted cumulative net revenue per Customer analysis illustrates our historical costs to acquire, retain and engage customers and the efficiency of our marketing expenses…

We further measure the efficiency of our marketing spend and the lifetime value of Customers by comparing the net contribution per Customer for an applicable cohort to our Cost per Customer.

(Emphasis added.)

40.     The Prospectus also stated that Blue Apron was already in the process of introducing new products which would help increase the Company's sales and profits:

"***We are currently in the process of introducing additional product expansions*** to increase both customer flexibility (the ability to select greater or fewer recipes per Order) and the number of recipe options (the ability to choose from a greater number of recipes each week). ***We expect that this product expansion will favorably impact our cumulative net revenue per Customer.***"

(Emphasis added.)

41.     With respect to the Company's ability to fulfill orders and achieve operational efficiencies, the Registration Statement stated:

**Operational Execution**

Our ability to effectively coordinate supply and demand and execute across our end-to-end value chain impacts our customer experience and our operating results. We begin by working with our suppliers, often months in advance of creating our menus. We then continue to forecast demand as well as monitor and evaluate our expected supply of ingredients, retaining flexibility to finalize recipes in the weeks leading up to shipment. We operate three technology-enabled, refrigerated fulfillment centers that collectively employ approximately 4,600 employees as of April 30, 2017. Each fulfillment center includes an operation that portions ingredients into exact quantities for each week's recipes using a combination of automated methods, manual labor, and warehousing, packaging and shipping operations. We utilize a company-managed, third-party delivery network that optimizes outbound logistics, including packing materials and the choice of carrier, on a zip code by zip code basis to ensure cost-effective, timely and safe delivery of our orders.

**Capital Investment to Support our Growth**

Our strategic investments in our fulfillment center operations will significantly impact our ability to continue to grow our business, introduce new products,

increase variety to customers, and create efficiencies in our cost structure. We have made significant investments to scale our operations and support the growth of our business, and we plan to continue this investment. In the near term, we plan to further invest in equipping our fulfillment centers with automated portioning and packaging equipment, which we believe will increase our operational efficiency. In 2016, we also signed leases and began building out two new fulfillment centers in New Jersey and California.

42.     With respect to cost of goods sold, the Prospectus stated:

**Cost of Goods Sold, excluding Depreciation and Amortization**

Cost of goods sold, excluding depreciation and amortization, consists of product and fulfillment costs. Product costs include the cost of food, packaging for food that is portioned prior to delivery to customers, labor and related personnel costs incurred to portion food for our meals, inbound shipping costs, and cost of products sold through Blue Apron Wine, Blue Apron Market, and BN Ranch. Fulfillment costs consist of costs incurred in the shipping and handling of inventory including the shipping costs to our customers, labor and related personnel costs related to receiving, inspecting, warehousing, picking inventory, and preparing customer orders for shipment, and the cost of packaging materials and shipping supplies. ***While we expect these expenses to increase in dollar amount to support our growth, we expect such expenses to decrease as a percentage of net revenue over time as we continue to scale our business.***

(Emphasis added).

43.     The statements referenced in ¶¶ 33-42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: : (i) rather than continue to significantly increase spending on advertising, Blue Apron had already decided to significantly reduce spending on advertising in Q2 2017, which would hurt sales and profit margins in future quarters; (ii) Blue Apron was already experiencing adverse on-time in-full rates, meaning orders were not arriving on time or with all the ingredients needed, which was hurting customer retention; (iii) the Company had encountered delays in Q2 2017 associated with its new factory in Linden, New Jersey, a factory which is expected to eventually account for

more than half of the meal kits Blue Apron sells; (iv) existing and already-materialized delays at the Company's new factory in Linden were resulting in additional delays in new product rollouts, which was limiting Blue Apron's ability to gain new customers and retain existing ones; (v) the foregoing delays would hurt the Company's bottom line in the near-term, particularly affecting the important metric of lifetime value per customer (*i.e.*, the net profit Blue Apron makes off a customer); (vi) the Company was unable to fully execute its new product initiatives; (vii) Blue Apron had already decided it would be forced to change its strategic approach in managing the business for the remainder of 2017; and (viii) as a result of the foregoing, Blue Apron's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

44.     On July 25, 2017, Blue Apron announced that Matthew Wadiak, one of the Company's co-founders, was stepping down from his role as Chief Operating Officer and would transition to serve as a senior advisor to the company.

45.     On August 10, 2017, Blue Apron announced its Q2 2017 results and lowered guidance for the second half of 2017.

46.     When Blue Apron reported earnings for Q2 2017 on August 10, 2017, it said that it had run into delays with its new factory in Linden, New Jersey. The plant is expected to eventually account for more than half of the meal kits Blue Apron sells, hut only contributed about 3% of the network's national volume in Q2 2017. As reported by *Market Watch*: "That means additional delays in new product rollouts, which will limit the company's ability to gain new customers and retain existing ones. 'While management is focused on speedy resolution and regaining execution velocity, the slowdown in business momentum highlights the risks in an operationally/logistically intensive business,' analysts wrote in a note. 'We opt to move to the

sidelines given a lack of visibility on timing for a full recovery and costs associated with the effort." *See* Ciara Linnane, "Blue Market Slides Another 2% Premarket as SunTrust Downgrades to Hold," *Market Watch*, Aug. 11, 2017.

47.     On the conference call with analysts to discuss Blue Apron's Q2 2017 earnings, Defendant Brad Dickerson, the Company's CFO, surprised analysts by stating that Blue Apron was cutting its guidance for the second half of 2017, indicating that the delays had 'changed our strategic approach in managing the business for the remainder of 2017."

48.     During the call with analysts, Defendant Dickerson also admitted that "The success of Linden is extremely important to our long-term initiatives."

49.     The delays at Linden already existed at the time of the IPO. The first shipment from Linden occurred on May 15, 2017.

50.     Due to delays in the planned rollout of the Linden factory as well as the fact that the company did not raise as much in its initial public offering as planned, Dickerson said on the earnings call with analysts that the company would also be lowering its capital expenditure guidance. Blue Apron had previously set guidance of $100 million to $180 million in the Prospectus for 2017 and 2018, but Dickerson said Blue Apron now expects it be between $75 million and $115 million. Another stated reason for lowered capex guidance was the fact the company expects to push back the opening of another new factory in California, which it had planned for 2018.

51.     Blue Apron also unexpectedly told analysts that it would be reducing spending on advertising, which will hurt its ability to attract new customers and compete with its competitors, including Amazon. During the Q2 earnings call with analysts on August 10, 2017, Defendant Matt Salzberg, the Company's CEO, stated: "The most significant driver of our results was the

planned reduction in marketing spend between the first and second quarter. In the second quarter, we grew revenue 18% year-over-year, while reducing marketing significantly from $61 million to $35 million between the first and second quarter." In other words, Blue Apron was only able to achieve the numbers it did for Q2 2017 by drastically reducing advertising spending in Q2 2017 from $61 million to $35 million. This emergency reduction in advertising spending was not disclosed in the Prospectus, and was hardly what investors expected after the Company had advised them that it was rapidly expanding and that increased spending on advertising was key to the Company's new product initiatives and future success.

52.     Commenting on the importance of the delays to the Company's key metrics, CEO Matt Salzberg stated: "We are hyper-focused on maintaining strong performance on metrics like on-time in-full, or OTIF, to ensure seamless customer experiences and will be more deliberate in expanding our offerings to customers with the current performance levels. ***We know lower than average OTIF scores directly impact our customer lifetime values, especially for customers early in their lifecycle with us, and we have seen some impact as part of this rollout***." (Emphasis added).

53.     Following this news, Blue Apron stock dropped $1.10 per share or over 17% to close at $5.14 per share on August 10, 2017, a 50% drop from the IPO price.

54.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Blue Apron securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Blue Apron securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Blue Apron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Blue Apron;

- whether the Individual Defendants caused Blue Apron to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Blue Apron securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

61.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Blue Apron securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Blue Apron securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

62.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

63.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Blue Apron securities during the Class Period.

68.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

69.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and

disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

70. As a result of the foregoing, the market price of Blue Apron securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Blue Apron securities during the Class Period in purchasing Blue Apron securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

71. Had Plaintiff and the other members of the Class been aware that the market price of Blue Apron securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Blue Apron securities at the artificially inflated prices that they did, or at all.

72. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

73. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Blue Apron securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

74.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

76.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

77.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Blue Apron securities.

78.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general

operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

79.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## COUNT III

**(Violations of Section 11 of The Securities Act Against All Defendants)**

80.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

81.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Individual Defendants.

82.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

83.     Blue Apron is the registrant for the IPO. Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

84.     As issuer of the shares, Blue Apron is strictly liable to Plaintiff and the Class for the misstatements and omissions.

85.     None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

86.     By reasons of the conduct herein alleged, each Individual Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

87.     Plaintiff acquired Blue Apron securities pursuant and/or traceable to the Registration Statement for the IPO.

88.     Plaintiff and the Class have sustained damages. The value of Blue Apron securities has declined substantially subsequent to and due to the Individual Defendants' violations.

## COUNT IV

**(Violations of Section 15 of The Securities Act Against the Individual Defendants)**

89.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

90.     This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

91.     Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Blue Apron within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause Blue Apron to engage in the acts described herein.

92.     Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

93.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: August 25, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*